**NOT FOR PUBLICATION**                                      **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRUSTEES OF THE LOCAL 1245 HEALTH FUND and TRUSTEES OF THE LOCAL 1245 LABOR-MANAGEMENT PENSION FUND,<br><br>          Plaintiffs,<br><br>v.<br><br>KEY HANDLING SYSTEMS, INC., et al.,<br><br>          Defendants. | Civil Action No. 13-2749 (JLL)<br><br><br>**OPINION** |

**LINARES,** District Judge**.**

        This case arises out of allegations that Defendants were delinquent in contributing to welfare and pension benefits due and owing to Plaintiff Trust Funds pursuant to the terms of the parties' underlying collective bargaining agreements.   Currently before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The Court has considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78.   For the reasons set forth below, Plaintiffs' motion for summary judgment is granted in part and denied in part.   Defendants' respective motions for summary judgment are granted.

## I.        BACKGROUND

        The Court first addresses Plaintiffs' motion for summary judgment.  The following relevant facts are not in dispute unless noted otherwise.[1]

_____

[1] Local Civil Rule 56.1 provides, in pertinent part as follows: "The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts,

1

The Health Fund is a joint labor-management-sponsored employee welfare benefit fund providing a program of health, welfare, and related benefits for its participants and beneficiaries, and is governed by ERISA, 29 U.S.C. § 1001 et seq.  The Health Fund is funded through employer contributions made under collective bargaining agreements with UFCW Local 1245 ("the Union").

The Pension Fund is a joint labor-management-sponsored multiemployer employee pension benefit fund, providing a program of pension benefits for its participants and beneficiaries, and is governed by ERISA.  The Pension Fund pays benefits out of employer contributions made under collective bargaining agreements with the Union and any investment income generated by those contributions.  The Pension Fund is governed by its Trust Agreement.

The Trustees of the Pension Fund have adopted guidelines for how to handle delinquent contributions.  The Trustees of the Pension Fund adopted 3% as the interest rate for contributions that are not paid after 60 days.   The Health Fund is governed by a Restated Agreement and Declaration of Trust.  The Trustees of the Health Fund have also adopted guidelines for how to handle delinquent contributions.  The Trustees of the Health Fund adopted 3% as the interest rate for contributions that are not paid after 60 days.   Article VI, Section 1 of the Pension Trust Agreement provide that employer contributions are payable in the amounts set forth in the

---

addressing each paragraph of the movant's statement, indicating agreement or disagreement and, **if not agreed, stating each material fact in dispute and citing to the affidavits and other documents** submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." (emphasis added).  Thus, to the extent any statements of material fact are "denied" or "disputed" without proper citation to evidence in the record, the Court deems such statements as undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

collective bargaining agreement, are payable monthly, and become delinquent if not paid within 30 days from when they are due.  Delinquent employers are notified of delinquencies in writing, and interest at the rate of 3% are due on delinquent contributions for the period beginning on the 30th day after the contributions are due until they are paid.  The Pension Fund's separate Delinquency and Collection Audit Guidelines further provide that liquidated damages shall be due and owing upon a Judgment in favor of the Fund, calculated at 20% of any amount found to be due and owing.  The Delinquency and Collection Audit Guidelines also provide for "reasonable" attorney's fees and costs in accordance with ERISA, upon a Judgment in favor of the Fund.

Article II, Section 1 of the Health Fund's Trust Agreement provides that employer contributions are payable in the amounts set forth in the collective bargaining agreement, are payable monthly, and become delinquent if not paid within 30 days from when they are due.  Contributions not paid within 60 days of when they are due are subject to interest at 3%, the rate set by the Trustees, for the period beginning on the 30th day after the contributions were due until paid; delinquent employers are also subject to liquidated damages, and all expenses of collection, including accounting and counsel fees.  The Health Fund's Delinquency and Collection Audit Guidelines provide that interest on delinquent contributions is calculated from the date the contributions were due until the date the contributions are paid, at the rate specified in the Trust Agreement.  The Health Fund's Delinquency and Collection Audit Guidelines provide that liquidated damages shall be due and owing upon a Judgment in favor of the Fund, calculated at 20% of any amount found to be due and owing.  The Health Fund's Delinquency and Collection Audit Guidelines also provide for "reasonable" attorney's fees and costs in accordance with ERISA, upon a Judgment in favor of the Fund.

Defendant Key Handling Key Handling was, during the relevant time period, in the business of designing, engineering, and installing conveyors in distribution facilities. Key Handling was a contributing member to both the Pension Fund and the Health Fund. As such, it made monthly contributions to each fund on behalf of its employees who were covered by a collective bargaining agreement, including but not limited UFCW Local 1245. Key Handling is incorporated in New Jersey and its principal place of business was Moonachie, NJ. During the relevant time period, Key Handling was owned solely by members of the Stefan and Van Melis families.

William Stefan has been president of Key Handling from 2010 to the present. William Stefan has been Chief Executive Officer of Key Handling from 2010 to the present. William Stefan owned at least 34% of the outstanding shares in Key Handling as of February 2014. From March 2010 through May 2013, William Stefan authorized 39 separate transfers or loans to Key Handling, totaling $3,207,216.07. Several of those transfers or loans were drawn from Mr. Stefan's personal bank accounts, and others were drawn from a bank account of Intermodal Properties, LLC (a limited liability corporation owned by Mr. Stefan). The transfers or loans from Mr. Stefan's personal account and the Intermodal account went into Key Handling's operating account to pay creditors, including Automated Control Technologies, LLC and AllA-Electric.

Steven Van Melis was Vice President of Key Handling from 1997 to February 2013. As Vice President, Steven Van Melis was in charge of Key Handling's computer system infrastructure, field personnel, and parts and service department. As Vice President, Steven Van Melis had the authority to sign checks for Key Handling. Steven Van Melis worked as Director of MIS for Key Handling, responsible for selling various items of material handling equipment,

from March 2010 to February 2013.  Approximately 660 shares of stock were issued for Key Handling.  Prior to this litigation, Steven Van Melis owned 330 shares in Key Handling.

Key Handling was party to a collective bargaining agreement in 2000 with UFCW Local 174 that was in effect from March 1, 2000 to March 1, 2003.  Article XXV of the 2000 collective bargaining agreement, entitled "Term of Agreement," provided, in part, that:

> If the Employer is a corporate or partnership, it shall bind the individual principals and partners thereof, and shall apply to all shops operated by the Employer during the life of this Agreement.

The 2000-2003 collective bargaining agreement required Key Handling to make periodic contributions to the UFCW Local 174 Commercial Health Care Fund and the United Mechanics 150 Pension Fund.  In 2001, UFCW Local 1245 assumed the representation of Key Handling employees after UFCW Local 174 was put into trusteeship.

On May 1, 2003, UFCW Local 1245 and Key Handling entered into a successor memorandum of agreement for the term March 1, 2003 to March 1, 2004.

On February 26, 2004, UFCW Local 1245 and Key Handling entered into a successor Memorandum of Agreement with a term of March 1, 2004 through February 29, 2007.  Robert Bonjione, C.F.O. and Steve Van Melis, V.P., executed the 2004 on behalf of Key Handling.

In April 2007, UFCW Local 1245 and Key Handling entered into a successor Memorandum of Agreement with a term of March 1, 2007 through February 28, 2010.   Robert Bonjione, C.F.O., and Steve Van Melis, Vice President, executed the 2007 MOA on behalf of Key Handling.

On April 9, 2010, UFCW Local 1245 and Key Handling entered into a successor Memorandum of Agreement with a term of March 1, 2010 through February 28, 2011.  William

Stefan, President, and Steve Van Melis, Vice President, executed the 2010 MOA on behalf of Key Handling.

On March 18, 2011, UFCW Local 1245 and Key Handling entered into a successor Memorandum of Agreement with a term of March 1, 2011 through February 28, 2012.  William Stefan, President, and Steve Van Melis, Vice President, executed the 2011 MOA on behalf of Key Handling.

On April 10, 2012, UFCW Local 1245 and Key Handling entered into a successor Memorandum of Agreement with a term of March 1, 2012 through February 28, 2013 (hereinafter the 2012 MOA).  William Stefan, President, and Steve Van Melis, Vice President, executed the 2012 MOA on behalf of Key Handling.

In February 2012, Key Handling did not make its monthly contribution to the Health Fund and failed to make monthly contributions to the Health Fund thereafter.  In February 2012, Key Handling did not make its monthly contribution to the Pension Fund.  Key Handling made late payments to the Pension Fund for March and April 2012 and failed to make monthly contributions to the Pension Fund thereafter.  Key Handling ceased operations on or about February 13, 2013.

The provisions of the Collective Bargaining Agreement and Trust Agreement require employers to pay liquidated damages and interest on unpaid contributions, plus attorneys' fees and costs incurred by the Funds in collecting the unpaid contributions.  Both the Health and Pension Funds sent a delinquency notice to Key Handling on April 16, 2012.  Neither Fund received any contributions from Key Handling after sending the delinquency notice.  The Health Fund sent Key Handling a second delinquency notice on May 18, 2012, informing Key Handling that it was liable for interest on unpaid contributions. The Health Fund did not receive any contributions from Key Handling after sending this notice.  The Pension Fund sent Key Handling a second delinquency

notice on May 18, 2012, informing Key Handling that it was liable for interest on unpaid contributions. The Pension Fund did not receive any contributions from Key Handling after sending this notice. The Health Fund sent Key Handling a letter on June 25, 2012, advising Key Handling that, because its delinquent contributions still had not been paid, health benefits to its employees would be suspended as of August 1, 2012 if the delinquency was not paid by July 16, 2012. The Pension Fund sent Key Handling a letter on June 25, 2012, advising Key Handling that, because its delinquent contributions still had not been paid, that the matter would be turned over to the Fund's counsel as of July 6, 2012.

On November 27, 2012, William Stefan wrote to Vincent DeVito, Chair of the Board of Trustees of both Funds, claiming a projected increase in sales for Key Handling in 2013, and promising to make substantial payment towards its delinquent accounts before the end of 2012 and in to 2013. After receiving Mr. Stefan's November 27, 2012 letter, the Trustees of the Health Fund and the Pension Fund agreed to allow Key Handling until January 15, 2013 to pay $100,000 of the delinquency, and establish a written agreement to pay the remainder, memorialized in a letter from Donna Colucci to William Stefan dated December 7, 2012. As of December 19, 2014, Key Handling has not made any payments toward its delinquent contributions. The Pension Fund entered critical status in 2009. Participating employers, including Key Handling, received notice of the Pension Fund's critical status. The critical status required the Pension Plan to assess a 5% surcharge on employer contributions in 2009 and a 10% surcharge on employer contributions in 2010 and the years thereafter. Key Handling's last payment for the Pension Plan's surcharge was in February 2012. Key Handling has made no subsequent payments for the assessed surcharge. The Pension Fund assessed a 3% interest rate on unpaid Pension Plan surcharges.

As of December 19, 2014, Key Handling owes the Local 1245 Health Fund $188,019.00 in delinquent contributions, $37,603.80 in liquidated damages, and $22,566.15 in interest.  As of December 19, 2014, Key Handling owes the Local 1245 Labor-Management Pension Fund $27,248.00 in delinquent contributions, $7,449.60 in liquidated damages, $2,589.66 in interest, $8.177 in surcharges, and $692 in interest on the surcharges.

In light of the foregoing, Plaintiff commenced the instant cause of action in in April 2013 seeking unpaid contributions to the Health Fund and Pension Fund, and enforcement of the collective bargaining agreements, pursuant to the Labor Management Relations Act, 29 U.S.C. § 141, et seq., and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, et seq.  This Court's jurisdiction over Plaintiff's Complaint is premised on federal question, 28 U.S.C. § 1331.  The parties have filed cross-motions for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).   If a reasonable juror could return a verdict for the non-moving party regarding material disputed

factual issues, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

## III.   DISCUSSION

The Court begins by noting that Defendant Key Handling does not oppose Plaintiff's motion for summary judgment.  In particular, Key Handling does not dispute its *liability* to the Funds for delinquent contributions, liquidated damages, interest or reasonable attorney's fees and costs pursuant to the various collective bargaining agreements and successor memoranda agreements.   Nor has Key Handling—or any of the individual Defendants—raised any issues of material fact in dispute regarding the *amounts* owed to the Funds for the delinquent contributions, liquidated damages or interest.[2]   Because Plaintiffs' entitlement to the foregoing amounts is

---

[2] Although Key Handling generally disputes that the Funds "are entitled to liquidated damages, interest, surcharges and interest on the surcharges" in response to paragraphs 78 and 79 of Plaintiff's Statement of Undisputed Material Facts, Key Handling cites to no evidence in the record in support of such denial.  As stated above, Local Civil Rule 56.1 provides, in pertinent part as follows: "The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, **if not agreed, stating each material fact in dispute and citing to the affidavits and other documents** submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."  (emphasis added).  Because paragraphs 78 and 79 of Key Handling's Response to Plaintiff's Statement of Undisputed Material Facts indicate, in relevant part, "denied" without proper citation to evidence in the record, the Court deems paragraphs 78 and 79 of Plaintiff's 56.1 Statement as undisputed for purposes of this motion.  *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion.").

supported by substantial evidence contained in the record,[3] Plaintiff's motion for summary judgment is granted vis-à-vis Defendant Key Handling on the issue of *liability* to the Funds for delinquent contributions, liquidated damages, interest, reasonable attorney's fees and costs pursuant to the various collective bargaining agreements and successor memoranda agreements. As to the issue of damages, the Court holds that as of December 19, 2014, Key Handling owes: (a) the Local 1245 Health Fund $188,019.00 in delinquent contributions, $37,603.80 in liquidated damages, and $22,566.15 in interest; and (b) the Local 1245 Labor-Management Pension Fund $27,248.00 in delinquent contributions, $7,449.60 in liquidated damages, $2,589.66 in interest, $8.177 in surcharges, and $692 in interest on the surcharges. Such figures are supported by competent evidence contained in the record and Key Handling has failed to come forward with any evidence raising a genuine issue of material fact as to same.[4]

Thus, there are only two outstanding issues before this Court: (1) whether the individual Defendants (Mr. Stefan and Mr. Van Melis) are also liable to the Funds, and (2) whether Plaintiffs are entitled to the *amount* of attorney's fees and costs they seek. The Court will address each issue, in turn.

### A.       Individual Defendants' Liability

Plaintiffs seek to impose individual liability on Defendants Stefan and Van Melis for Key Handling's delinquent contributions to the Funds. Generally speaking, Plaintiffs' theory of liability vis-à-vis the Individual Defendants is premised on the following: (a) Stefan (in his capacity as President of Key Handling) and Van Melis (in his capacity of Vice President of Key

---

[3] *See* Colucci Decl., ¶¶ 28, 29; Colucci Dec., Exs. A, B, C, D.

[4] *See* Colucci Decl., ¶¶ 28, 29; Colucci Dec., Exs. A, B, C, D.

Handling) each signed the 2012 MOA that was in effect when Key Handling ceased its operations in or around February 2013; (b) the 2012 MOA incorporated by reference, *inter alia*, Article XXV of the 2000 collective bargaining agreement, which provided that "[i]f the Employer is a corporate or partnership, it shall bind the individual principals and partners thereof, and shall apply to all shops operated by the Employer during the life of this Agreement;" (c) Stefan and Van Melis were "principals" as the term is "commonly understood," and (d) as such, Stefan and Van Melis are personally liable for Key Handling's delinquent contributions to the Funds pursuant to Article XXV.  In the alternative, Plaintiffs urge the Court to hold Stefan individually liable for Key Handling's contractual obligations by piercing its corporate veil.  In particular, Plaintiffs argue that, instead of respecting the corporate form and formalities of Key Handling, Defendant Stefan made "transfers between himself and the businesses he owned without documenting such payments as loans or obtaining approval of the other shareholders/members of the corporate entities, resulting in a commingling of funds among himself and the businesses he owned, including Key Handling." (Pl. Br. at 17).

The Individual Defendants present the following arguments in opposition to Plaintiffs' motion.  First, the Individual Defendants argue that Article XXV is not a personal guarantee, and even if it is construed as such, it is not enforceable as against them because: (a) neither signed any of the documents at issue in their individual capacity, and (b) such guarantee violates the statute of frauds inasmuch as the original agreement containing Article XXV was never signed by either of the Individual Defendants.  Defendant Stefan also argues that his actions in executing certain loans to Key Handling, without more, is insufficient to pierce the corporate veil.

11

Having carefully considered the parties' arguments and based on the reasons that follow, the Court finds that Plaintiffs' motion for summary judgment must be denied to the extent they seek to impose liability on the Individual Defendants.

As a general matter, federal law governs disputes arising under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a).  *See Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457 (1957). However, state law, "if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy." *Id.*  Neither side disputes that New Jersey law applies in determining whether the Individual Defendants personally guaranteed the payment of Key Handling's debt.

When interpreting contracts of guaranty, the rules governing the construction of contracts apply. *See, e.g., Garfield Trust Co. v. Teichmann*, 24 N.J. Super. 519, 526-27 (App. Div. 1953). As stated above, the issue here is whether the Individual Defendants exposed themselves to personal liability when they signed the April 10, 2012 Memorandum of Agreement. In addition to applying contract principles, this consideration is further guided by agency principles. 7 W. Fletcher, Cyclopedia Corporations § 3005 at 121.  "It is well-established principle that an agent 'will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.' " *Home Buyers Warranty v. Roblyn Dev. Corp.*, No. A-0500-05T5, 2006 WL 2190742, at *4 (N.J. Super. Ct. App. Div. Aug. 4, 2006) (quoting *Salzman Sign Co. v.. Beck*, 176 N.E.2d 74, 76 (N.Y. Ct. App. 1961)). In New Jersey, determinations of liability on a guaranty is governed, in part, by N.J. Stat. Ann. § 12A:3–401(a), which states:

> A person is not liable under an instrument unless the person signed the instrument or the person is represented by an agent or representative who signed the instrument and the signature is binding on the represented person under 12A:3–402.

*See also* N.J.S.A. § 12A:3–402; *City of Millville v. Rock*, 683 F. Supp. 2d 319, 326 (D.N.J. 2010).

In light of this standard, and based on the reasons that follow, the Court finds that Plaintiffs have failed to present clear and explicit evidence of the parties' intention to bind Stefan or Van Melis *personally*. First, the language of the contract does not support this contention. Article XXV, which is entitled "Term of Agreement," does not define "individual principals," and contains no reference whatsoever to a personal guarantee or a promise to pay. Evidence in the record confirms that not even Tom Cunningham—the Union Representative who negotiated and signed the 2012 MOA on behalf of the Union—understood what was meant by the term "principal" as it was used in Article XXV. *See* Docket Entry No. 54-14 at 3; Cunningham Dep. Tr. at 11:21-12:8. Evidence in the record also shows that neither of the Individual Defendants were signatories to the original document containing Article XXV, and that the language contained in Article XXV was never discussed during the negotiations that resulted in the 2012 MOA. *See* Docket Entry No. 54-13 at 13; Van Melis Dep. Tr. at 109-110. In fact, Mr. Cunningham testified that the first time he had ever read Article XXV was during his deposition in the context of this litigation. *See* Docket Entry No. 54-14 at 4; Cunningham Dep. Tr. at 55:1-4.

Even assuming, *arguendo*, that Article XXV was incorporated by reference into the April 10, 2012 Memorandum of Agreement, which was signed by the Individual Defendants, evidence in the record shows that the Individual Defendants signed the relevant document only once. Below each of their names is listed their respective titles, further suggesting that they signed in their professional capacities, on behalf of the company. *See* Docket Entry No. 54-16. There no other signatories to the April 10, 2012 Memorandum of Agreement on behalf of Key Handling. Thus, "if, in so signing the contract, [Stefan or Van Melis] signed on his own behalf, then who signed for the corporation?" *Home Buyers Warranty*, 2006 WL 2190742, at *5. In short, the Court finds

13

that the language of Article XXV falls short of establishing a personal guarantee of corporate obligations. *See generally Salzman Sign Co. v. Beck*, 10 N.Y.2d 63, 67 (1961) ("In modern times most commercial business is done between corporations, everyone in business knows that an individual stockholder or officer is not liable for his corporation's engagements unless he signs individually, and where individual responsibility is demanded the nearly universal practice is that the officer signs twice once as an officer and again as an individual."); *Home Buyers Warranty*, 2006 WL 2190742, at *5 ([W]hen an agent acts for a disclosed principal--as Wilson acted when he signed for the builder described in the contract--the agent does not become a party to the contract, id., § 320, and does not incur liability absent a clear and explicit expression in the contract.").

Even beyond the four corners of the relevant documents, there is no genuine issue of fact related to whether Stefan or Van Melis intended to personally guarantee Key Handling's obligations. Plaintiffs have failed to come forward with any evidence—in the form of deposition testimony or otherwise—suggesting that either of the Individual Defendants intended to personally guarantee Key Handling's obligations. To the contrary, Tom Cunningham—the Union Representative who negotiated and signed the 2012 MOA on behalf of the Union—testified that he had never even read Article XXV before his involvement in this litigation and that it was his "understanding that 174 contracts contain this language as sort of a boilerplate clause." *See* Docket Entry No. 54-14 at 4; Cunningham Dep. Tr. at 55:5-11. Viewing the transaction in its entirety and reading the "terms of the guaranty. . . in the light of commercial reality—in accord with the reasonable expectations of persons in the business community" the Court finds that the 2012 MOA and the circumstances surrounding same do not demonstrate that Stefan or Van Melis intended to be personally responsible for guarantying Key Handling's contributions to the Funds. *Mount Holly*

*State Bank v. Mount Holly Washington Hotel, Inc.*, 220 N.J. Super. 506, 508 (App. Div. 1987).  To be clear, in the absence of any evidence establishing that the parties' intended that the Individual Defendants would be personally responsible for guarantying Key Handling's contributions to the Funds, the Court declines to hold the Individual Defendants personally liable for Key Handling's debt to the Funds based upon boilerplate language (prepared by the Union), entitled "Term of Agreement," containing no reference to a personal guarantee, that was neither included in the document they signed (in their professional capacities), and was, indeed, never discussed during the negotiation of the 2012 MOA.  *See, e.g., Lanzafame v. Dana Restoration, Inc.,* No. 09-CV-0873 ENV JO, 2011 WL 1100111, at *2 (E.D.N.Y. Mar. 22, 2011) ("Here, there is no such clear and explicit evidence regarding DiMarco's personal liability. The . . . boilerplate text of the CBA, including the improper use of male pronouns in referring to DiMarco, the mixing of corporate and individual liability language in a single paragraph, and the absence of language in the CBA identifying DiMarco's role in the organization, are all factors that weigh against a finding of personal liability. Furthermore, the record does not suggest that DiMarco's personal guarantee of DRI's performance was discussed during negotiations.").

Turning now to Plaintiffs' second theory of imposing personal liability on Defendant Stefan, while the corporate veil is usually pierced in the parent-subsidiary context, courts may also pierce to reach individual owners, shareholders, or corporate officers. *See Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 172 n. 9 (3d Cir. 2002) ("Shareholders have also been found liable when they have totally dominated the corporation, failed to maintain the corporate identity, and used the corporation to perpetrate fraud, injustice or some other illegality"); *Hartford Fire Ins. Co. v. Conestoga Title Ins. Co.,* 328 N.J. Super. 456,

458, 461-62, 746 A.2d 460 (App. Div. 2000) (finding an individual who served as president of a corporation liable when he acted as a corporation's "alter ego" in disregarding the corporate form). In order to pierce the corporate veil in New Jersey, a plaintiff must establish that (1) the shareholder or parent so dominated the corporation or subsidiary that the two entities did not have a separate existence and (2) the shareholder or parent used the corporation or subsidiary "to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir. 1988).  In considering whether to pierce the corporate veil, courts take various factors into account, including:

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Craig*, 843 F.2d at 150 (quotation omitted).  Courts consider two prominent "hallmarks" of the abuse of the privilege of incorporation (i) the failure to engage the subsidiary in its own independent business due to exclusive performance of services for the parent or shareholder and (ii) the undercapitalization of the subsidiary to the extent that it is judgment-proof. *Nassau Constr. Co., Inc. v. Pulte Homes, Inc.*, No. 07-5536, 2008 WL 2235609, at *3 (D.N.J. May 29, 2008) (quoting *OTR Assocs. v. IBC Servs., Inc.,* 353 N.J. Super. 48, 51, 801 A.2d 407 (App. Div. 2002)). In other words, "the veil-piercing inquiry is focused not simply on an individual shareholder's level of personal involvement with a corporation, but rather on whether the corporate form itself is a sham." *N. Am. Steel Connection, Inc. v. Watson Metal Prods. Corp*., 515 F. App'x 176, 180 (3d Cir. 2013).

16

In support of its position that Defendant Stefan is liable under veil piercing, Plaintiffs argue that "instead of respecting the corporate form and formalities of Key Handling, Defendant Stefan made transfers between himself and the businesses he owned without documenting such payments as loans or obtaining the approval of the other shareholders/members of the corporate entitled, resulting in a commingling of funds amount himself and the businesses he owned, including Key Handling." (Pl. Br. at 16-17).   Having carefully considered the evidence in the record, the Court finds that—at most—there is evidence that Stefan made several personal loans to Key Handling beginning in or around 2010 and that he began receiving Key Handling's correspondence at his house once Key Handling ceased its operations—in or around February 2013.  *See* Stefan Dep. Tr. At 16:8-17:5.   Even if the Court were to agree that Stefan's personal loan(s) to Key Handling constituted a "blurring" of his and Key Handling's identities, "that fact is insufficient to justify piercing the corporate veil; rather, [Stefan] must have dominated [Key Handling] to such a degree that the corporation had 'no separate mind, will or existence of its own.' " *N. Am. Steel Connection*, 515 F. App'x at 181 (quoting *Craig*, 843 F.2d at 150).  Plaintiffs have not provided any evidence of such dominance.  Plaintiffs have not shown that Key Handling failed to observe the corporate formalities, much less that Stefan was using the corporation as a façade for his personal operations. In fact, as the Third Circuit has expressly stated, "taking out a personal loan for the benefit of the corporation is the opposite of 'siphoning of funds of the corporation by the dominant stockholder,' which is the type of evidence typically used to justify disregarding the corporate form." *N. Am. Steel Connection*, 515 F. App'x at 181 (quoting *Craig*, 843 F.2d at 150).  Because there is no evidence that Key Handling's corporate form was a sham, no reasonable jury could find a basis for piercing the corporate veil.

Because the evidence in the record precludes a finding that the parties intended that Stefan or Van Melis would be personally liable for Key Handling's delinquent contributions to the Funds pursuant to Article XXV when they signed the April 10, 2012 Memorandum of Agreement,[5] *and* given that there is no reasonable basis on which to pierce the corporate veil, Plaintiff's motion for summary judgment is denied to the extent it seeks to hold the Individual Defendants personally liable for Key handling's delinquent contributions to the Funds.  The Individual Defendants' cross-motion for summary judgment on this issue is granted.


     **B.**       **Plaintiffs' Attorney's Fees and Costs**

It is undisputed that the Funds incurred certain attorneys' fees and costs in litigating this action against Key Handling to recover the delinquencies owed.  It is also undisputed that Plaintiffs are entitled to reasonable attorneys' fees and costs under Section 502(g) of ERISA, 29 U.S.C. § 1132(g) and from the governing documents themselves.  *See* Colucci Declaration, Exs. B at 10 and D at 11.  The Court agrees, as a general matter, that Section 502(g)(2)(D) of ERISA entitles Plaintiffs, the prevailing party in this action, to reasonable attorney's fees and expenses.   Such requests are generally submitted pursuant to Federal Rule of Civil Procedure 54 and Local Civil Rules 54.1 and 54.2 once Judgment has been entered.  As such, while the Court agrees that Plaintiffs are entitled to reasonable attorney's fees and costs as the prevailing party in this action, the Court declines to award a specific amount at this time.  Once Judgment has been entered in

---

[5] *See generally Salzman*, 10 N.Y.2d at 67 (noting that "there is great danger in allowing a single sentence in a long contract to bind individually a person who signs only as a corporate officer.").

this matter, Plaintiffs shall submit an appropriate application for such attorney's fees and/or costs in accordance with all applicable Local Civil Rules and Federal Rules of Civil Procedure.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment [Entry No. 54] is **granted in part and denied in part.**  Summary judgment is granted in favor of Plaintiffs on the issue of Key Handling's liability to the Funds for delinquent contributions, liquidated damages, interest, and reasonable attorney's fees and costs pursuant to the various governing documents and Section 502(g) of ERISA.  Plaintiffs' motion for summary judgment is **denied** to the extent they seek to hold the Individual Defendants (Stefan and Van Melis) personally liable for Key Handling's delinquent contributions and related debt.  The Individual Defendants' respective motions for summary judgment [Entry Nos. 46, 56 and 59] are therefore **granted**.

The parties shall submit, within thirty (30) days, a proposed form of Judgment for the Court's consideration.[6]  In the interim, the Clerk's Office is hereby directed to close the Court's file in this matter.

An appropriate Order accompanies this Opinion.

DATED:  February 18, 2015

                                          s/ Jose L. Linares
                                          JOSE L. LINARES
                                          U.S. DISTRICT JUDGE

---

[6] As set forth above, it is undisputed that as of December 19, 2014, Key Handling owes the Local 1245 Health Fund $188,019.00 in delinquent contributions, $37,603.80 in liquidated damages, and $22,566.15 in interest.  As of December 19, 2014, Key Handling owes the Local 1245 Labor-Management Pension Fund $27,248.00 in delinquent contributions, $7,449.60 in liquidated damages, $2,589.66 in interest, $8.177 in surcharges, and $692 in interest on the surcharges.   These figures shall be updated by Plaintiffs to reflect the current amount due and owing as of the date of entry of the proposed form of Judgment.